**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Edward CONSTANT, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 5, 2007.

Filed May 15, 2007.

David Rudovsky, Philadelphia, for appellant.

Timothy J. Lyon, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

BEFORE: MUSMANNO, BENDER and POPOVICH, JJ.

OPINION BY MUSMANNO, J.:

¶ 1 Edward Constant ("Constant") appeals from the judgment of sentence entered following his conviction of two counts of criminal attempt (homicide), three counts of aggravated assault, and one count of recklessly endangering another person.[1] We affirm.

¶ 2 The trial court summarized the facts underlying the instant appeal as follows:

[O]n May 26, 2002, Mt. Lebanon Police Officers Daniel Rieg and Jeffrey Kite were called to respond to the report of a domestic disturbance at the residence that [Constant] shared with his wife, Susan Constant ["Susan"], at 105 Piper Drive in Mt. Lebanon, Penn-

sylvania. They arrived in separate vehicles and Officer Kite, the first officer to arrive, knocked on the front door. [Constant] answered the door and, according to Officer Kite, was angry, belligerent and hostile. Officer Rieg soon arrived and [Constant] also began to berate him. [Constant] referred to the officers as "Nazi bastards," told them that everything in the house was fine and slammed the door in their faces. Because the call was for a domestic disturbance and they had not talked to [Susan], and in light of [Constant's] obvious angry disposition, the officers again knocked on the door. They were greeted this time by [Susan,] who also appeared angry and told them that they needed to leave her and her husband alone. She attempted to again shut the door, but before she could do so, [Constant] reappeared behind his wife, still in an angry and agitated state, and grabbed his wife, causing her to fall to the floor. When she got back up, she again attempted to shut the door, but was prevented from doing so by Officer Rieg, who placed his foot in the doorway. After [Susan] fell[,] [Constant] briefly left the front hallway but soon returned, carrying a .44 caliber magnum revolver. He pointed the weapon directly at Officer Rieg and pulled the trigger. The bullet struck the officer in the chest, propelling him back through the doorway, onto the front porch and over the railing of the front porch into the front yard. Officer Rieg's protective vest prevented the bullet from entering his body.

After the shot, Officer Kite left the porch and attempted to find cover. He heard [Constant] fire again. Officer Rieg, who was now laying in the front yard, saw [Constant] point the gun to-

---

1. 18 Pa.C.S.A. §§ 901, 2702, 2705.

wards him again and fire several more times, missing him. As [Constant] came off the porch and approached him, Officer Rieg was able to pull his own weapon and fire twelve rounds towards [Constant]. One of his shots struck [Constant] in the buttocks, causing him to fall to the ground. Other officers arrived and were able to subdue [Constant]. As they were doing so, [Constant] continued to resist and referred to the officers as "Nazi bastards." The handgun that was seized from [Constant] contained six spent cartridges, indicating that it had been fired six times.

Trial Court Opinion, 1/20/06, at 4–5.

¶ 3 A jury found Constant guilty of the above-described charges after a trial before the Honorable David R. Cashman. However, the trial court granted Constant a new trial based upon improper comments from a member of Judge Cashman's staff to the jury. Prior to the new trial, Constant filed a Motion to dismiss, asserting that a new trial was barred by the United States and Pennsylvania Constitutions, as well as by 18 Pa.C.S.A. § 109. Constant also filed a Motion to recuse Judge Cashman. Judge Cashman denied the Motion to dismiss, but ultimately granted the Motion to recuse. The case was then assigned to the Honorable Jeffrey A. Manning for trial.

¶ 4 At the conclusion of the second trial, the jury again convicted Constant of the above-described offenses. At Count I (criminal attempt), the trial court sentenced Constant to a prison term of 96 to 192 months. At Count II (criminal attempt), the trial court imposed a consecutive prison term of 78 to 156 months. At Count III (aggravated assault), the trial court imposed a probation term of 10 years, to be served consecutive to Constant's sentence at Count II. At Count IV (aggravated assault), the trial court im-

posed another ten year term of probation, to be served consecutive to the sentence at Count II, but concurrent to Constant's sentence at Count III. The trial court imposed no further penalties for Constant's remaining convictions. Thereafter, Constant filed the instant timely appeal.

¶ 5 Constant presents the following claims for our review:

1. Whether the trial court erred in denying [Constant's] Motion to Dismiss based on double jeopardy principles and whether the court erred in failing to recuse itself from consideration of this Motion[?]

2. Whether the trial court denied [Constant] his constitutional right to a public trial when it precluded [Susan] from attending jury selection[?]

3. Whether the trial court erred in its evidentiary rulings by: (a) admitting evidence of [Constant's] alleged assault on [Susan] after [Constant] had been acquitted of that charge at his first trial; (b) denying admission of evidence of the complainant's bias; and (c) admitting evidence of unrelated prior bad acts[?]

4. Whether the trial court erred in precluding evidence, including expert testimony, of [Constant's] level of intoxication and in instructing the jury that [Constant] could be convicted of the intentional crime of attempted murder even if [Constant] never had the conscious intent to kill[?]

5. Whether the trial court erred by failing to instruct the jury[ ] (a) that it could consider the evidence of [Constant's] character for truthfulness in assessing his credibility; (b) that the defense of others was applicable to this case; and (c) that assault by physical menace was a lesser offense for which [Constant] could be convicted[?]

Brief of Appellant at 5. We will address these claims in order.

■ ¶ 6 Constant first claims that the trial court improperly denied his Motion to dismiss prosecution based upon the federal and state constitutional protections against double jeopardy. Constant claims that a member of Judge Cashman's staff engaged in impermissible contact with the deliberating jury, "with the clear intent to persuade the jury to convict [Constant]." *Id.* at 15. On this basis, Constant asserts that the constitutional protection against double jeopardy bars a retrial. We disagree.

■ ¶ 7 The Double Jeopardy Clause of the Fifth Amendment commands that "no person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." *Commonwealth v. McGee,* 560 Pa. 324, 744 A.2d 754, 756 (2000) (quoting U.S. Const. Amend. V). Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense. *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). The Pennsylvania Supreme Court has recognized that "the corresponding proscription contained in the Pennsylvania Constitution, Pa. Const. art. 1, § 10, 'involves the same meaning, purpose, and end[ ]'; thus, it has generally been construed as coextensive with its federal counterpart." *Id.* at 756 n. 2 (quoting *Commonwealth v. McCane,* 517 Pa. 489, 539 A.2d 340, 346 n. 5 (1988)).

■ ¶ 8 In this case, Constant filed a Motion for a new trial, which the trial court granted, based upon the conduct of the trial judge's tipstaff. "It is firmly established that a defendant who has been convicted and upon his own motion secures a new trial may not plead double jeopardy on his second trial." *Commonwealth v.*

*Thomas,* 448 Pa. 42, 292 A.2d 352, 355 (1972) (citing *Commonwealth v. Melton,* 406 Pa. 343, 178 A.2d 728 (1962) and *Commonwealth ex rel. Patrick v. Banmiller,* 398 Pa. 163, 157 A.2d 214 (1960)); *see Commonwealth v. Einhorn,* 911 A.2d 960, 969 (Pa.Super.2006) (recognizing that because the appellant's petition for a new trial had been granted, the appellant waived his double jeopardy claim).

¶ 9 Constant asserts, however, that the double jeopardy clause will bar a retrial where prosecutorial or judicial overreaching "was intended to prejudice the defendant and thereby deny him a fair trial." Brief of Appellant at 14 (quoting *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321, 325 (1992) and *Commonwealth v. Martorano,* 559 Pa. 533, 741 A.2d 1221, 1223 (1999)). In *Smith,* the Pennsylvania Supreme Court held that the prosecutor's misconduct "had constitutional implications under the double jeopardy clause which prohibit retrial." *Smith,* 615 A.2d at 321–22. The defendant in *Smith* had been accused of murder. *Id.* Following his direct appeal, the defendant discovered that the prosecutor had withheld information regarding a favorable sentencing recommendation given to the prosecution's chief witness and that the prosecution had knowingly withheld exculpatory physical evidence. *Id.* at 323. The Pennsylvania Supreme Court held that the double jeopardy clause prohibits retrial "when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.* at 325. On this basis, the Supreme Court reversed the order of the trial court, which had denied the defendant's motion to dismiss, and discharged the defendant.

¶ 10 In *Martorano,* the Pennsylvania Supreme Court amplified the *Smith* standard and held that double jeopardy barred retrial of the defendant where the prosecutor

committed misconduct including, "blatantly disregarding the trial court's evidentiary rulings, disparaging the integrity of the trial court in the front of the jury, and repeatedly alluding to evidence that the prosecutor knew did not exist." *Martorano*, 741 A.2d at 1222. The Pennsylvania Supreme Court held that, where the prosecutor's action "evinces the prosecutor's intent to deprive Appellant of a fair trial; to ignore the bounds of legitimate advocacy; in short, to win a conviction by any means necessary[,]" double jeopardy protection applies. *Id.* at 1223.

¶ 11 However, both *Smith* and *Martorano* involved the application of the double jeopardy clause where the defendant had not filed a motion for a new trial. The Pennsylvania Supreme Court has expressly refused to bar retrial on double jeopardy grounds where the defendant has filed a motion for a new trial. *See Thomas*, 292 A.2d at 355 (stating that an appellant's voluntary act of seeking and receiving a new trial constitutes a waiver of *any* double jeopardy claim); *Commonwealth v. Sanford*, 497 Pa. 442, 441 A.2d 1220, 1221 (1982) (same). The Pennsylvania Supreme Court has allowed no exceptions under this procedural scenario, and we are bound by its holdings. Accordingly, we conclude that because Constant was granted a new trial on his own Motion, he has waived his claim that the constitutional protection against double jeopardy bars his retrial.

■■■¶ 12 Constant also asserts that Judge Cashman improperly refused to recuse himself prior to resolving the Motion to dismiss, or to conduct an evidentiary hearing on the Motion. However, as stated *supra*, Constant's voluntary act of seeking and receiving a new trial constituted a waiver of his double jeopardy claim. *See Thomas, supra*. An evidentiary hearing would not have assisted in the resolution of Constant's claim. In addition, because

Constant waived his double jeopardy claim, any error by Judge Cashman in denying the recusal Motion prior to considering the Motion to dismiss was harmless. *See Commonwealth v. Samuels*, 566 Pa. 109, 778 A.2d 638, 641 (2001) (stating that a judgment of sentence will be affirmed in spite of an error only where the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict). Accordingly, Constant is not entitled to relief on these claims.

■■ ¶ 13 Constant next claims that the trial court erred when it precluded his wife, Susan, from attending the jury selection proceedings. According to Constant, the trial court's ruling deprived him of his right to a public trial. Brief of Appellant at 24–25. Constant additionally points out that the federal courts have upheld the right of a defendant's family members to attend the criminal trial. *Id.* at 25.

■■ ¶ 14 The Sixth Amendment right to a public trial in a criminal case is binding on the states through the due process clause of the Fourteenth Amendment. *Commonwealth v. Johnson*, 309 Pa.Super. 367, 455 A.2d 654, 659 (1982) (citing *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *United States ex rel. Bennett v. Rundle*, 419 F.2d 599 (3rd Cir.1969)). The Pennsylvania Constitution likewise guarantees an accused's right to a public trial. Pa. Const. Art. 1, sec. 9, 11. The right to a public trial is applicable to *voir dire* proceedings. *Press–Enterprise Company v. Superior Court*, 464 U.S. 501, 508–10, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Johnson*, 455 A.2d at 659.

¶ 15 In this case, defense counsel requested permission for Susan to be present during *voir dire*. N.T., 1/20–21/05, at 165. Defense counsel, who made this request at the close of the first day of *voir*

*dire,* indicated that Susan wanted to be present "[b]ecause she loves her husband and wants to be there." *Id.* at 166. The trial court acknowledged that "the media is generally allowed to participate[.]" *Id.* at 167. However, the trial court denied Susan permission to attend stating that "[w]e don't have space." [2] *Id.* On appeal, Constant does not challenge the trial court's assessment of the space limitations during *voir dire.*

¶ 16 In determining whether the *voir dire* procedure in the instant case violated Constant's right to a public trial, we keep in mind that such right serves two general purposes: (1) to prevent an accused from being subject to a star chamber proceeding; and (2) to assure the public that standards of fairness are being observed. *Commonwealth v. Harris,* 550 Pa. 92, 703 A.2d 441, 445 (1997) (citing *Commonwealth v. Berrigan,* 509 Pa. 118, 501 A.2d 226 (1985)). "The public's right to attend a trial is not absolute, and exists as a guarantee of fairness in judicial conduct during criminal court proceedings." *Berrigan,* 501 A.2d at 234. "Where trial courts perceive a threat to the orderly administration of justice in their courtrooms by an unmanageable public, they may always place reasonable restrictions on access to the courtroom, so long as the basic guarantees of fairness are preserved such as by the presence of the press and the making of a record for later review." *Id.*

¶ 17 In this case, the trial court permitted the media to attend *voir dire* proceedings, and the proceedings were transcribed by a court reporter. N.T., 1/20–21/05, at 167. Keeping in mind the trial court's assessment of the space limitations, we cannot conclude that Constant was denied his right to a public trial because of the exclusion of a member of the general public, Susan, from the proceedings. [3] Accordingly, Constant is not entitled to relief on this claim.

¶ 18 Constant next claims that the trial court erred in several of its evidentiary rulings. Specifically, Constant claims that the trial court improperly (1) admitted evidence of Constant's alleged assault on his wife, after he had been acquitted of that charge; (2) denied admission of evidence regarding the complainant's bias; and (3) admitted evidence of unrelated criminal acts. Brief of Appellant at 27. We will address each contention in turn.

¶ 19 Constant first asserts that the trial court improperly admitted evidence related to the alleged assault on his wife. According to Constant, he was acquitted of assaulting his wife in the prior trial, which would indicate that the jury did not believe the testimony of the police officers. Constant argues that because the jury rejected

---

**2.** In its Opinion, the trial court denied Constant a new trial on two bases: (1) the record did not support Constant's claim that his wife was barred from the courtroom during *voir dire;* and (2) Constant failed to establish prejudice. We affirm the trial court's denial of a new trial, albeit on different grounds. *See Commonwealth v. Singletary,* 803 A.2d 769, 772–73 (Pa.Super.2002) (stating that "[i]t is well settled that where the result is correct, an appellate court may affirm a lower court's decision on any ground without regard to the ground relied upon by the lower court itself").

**3.** Constant directs this Court's attention to several federal court decisions regarding the attendance of family members at court proceedings. Constant cites no Pennsylvania state court decisions supporting his contention. *See Commonwealth v. Giffin,* 407 Pa.Super. 15, 595 A.2d 101, 107 (1991) (stating that in the absence of a ruling on a particular question by the United States Supreme Court, the decision of a federal intermediate appellate panel or a federal district court is not binding on Pennsylvania courts). We decline to apply the federal court's holdings under the circumstances presented in this case.

the testimony of the officers in the prior trial, the doctrine of collateral estoppel should preclude the same evidence in this trial. We disagree.

¶ 20 Initially, we are mindful that the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's evidentiary decisions will not be overturned absent an abuse of discretion. *Commonwealth v. Edwards*, 588 Pa. 151, 903 A.2d 1139, 1156 (2006).

¶ 21 "The doctrine of collateral estoppel is a part of the Fifth Amendment's guarantee against double jeopardy, which was made applicable to the states through the Fourteenth Amendment." *Commonwealth v. Holder*, 569 Pa. 474, 805 A.2d 499, 502 (2002) (citations omitted).

... The phrase "collateral estoppel," also known as "issue preclusion," simply means that when an issue of law, evidentiary fact, or ultimate fact has been determined by a valid and final judgment, that issue cannot be litigated again between the same parties in any future lawsuit. Collateral estoppel does not automatically bar a subsequent prosecution, but rather, it bars redetermination in a second prosecution of those issues necessarily determined between the parties in a first proceeding that has become a final judgment.

Traditionally, Pennsylvania courts have applied the collateral estoppel doctrine only if the following threshold requirements are met: 1) the issues in the two actions are sufficiently similar and sufficiently material to justify invoking the doctrine; 2) the issue was actually litigated in the first action; and 3) a final judgment on the specific issue in question was issued in the first action. An issue is actually litigated when it is properly raised, submitted for determination, and then actually determined. For collateral estoppel purposes, a final

judgment includes any prior adjudication of an issue in another action that is sufficiently firm to be accorded conclusive effect.

*Id.* at 502–03 (footnotes and citations omitted).

¶ 22 In its Opinion, the trial court determined that the doctrine of collateral estoppel did not preclude the admission of the police officers' testimony in the instant case. The trial court stated,

In this case, the jury's acquittal of [Constant] of simple assault did not necessarily mean that the jury found, as a fact, that [Constant] did not, as the officers testified, cause his wife to fall to the ground. Whether or not he pushed her to the ground was not an ultimate fact that had to be decided with regard to the charge of simple assault. The jury could just have easily based their verdict on a lack of bodily injury or a lack of intent to cause bodily injury. The jury could very well have believed the officer[s'] testimony that [Constant] knocked his wife to the ground and still found him not guilty of that offense. Because the fact that [Constant] knocked his wife to the ground was not necessarily decided by the jury when they acquitted him of Simple Assault, this Court correctly denied [Constant's] motion seeking to preclude any reference to that occurrence.

Trial Court Opinion, 1/20/06, at 7–8. The trial court's rationale is sound, and we affirm on that basis.

¶ 23 Constant next asserts that the trial court improperly denied admission of evidence regarding the complainant's bias. Constant asserts that at trial, he sought to establish the bias of Officer Rieg by introducing evidence of Officer Rieg's civil suit against Constant. Brief for Appellant at 29. In that suit, which

was pending at the time of the instant trial, Officer Rieg sought damages for the injuries caused by Constant. *Id.* Constant asserts that the trial court improperly precluded him from asking questions regarding the nature of the suit, other than the fact of its existence. *Id.*

¶ 24 Once again, the trial court's Opinion concisely addresses this claim:

> [Constant's] claim ignores the fact that [Constant] was permitted to introduce into evidence the fact that Officer Rieg had filed a civil lawsuit against [Constant] and his wife seeking damages for the injuries [Officer Rieg] suffered as a result of this incident. What the Court did not permit counsel to do, however, was to get into the specific details of that lawsuit. While the existence of the civil suit filed by Officer Rieg against [Constant] may have had some marginal relevance in showing that Officer Rieg may have had an interest in the outcome of this matter, the specific details of any such lawsuit were completely irrelevant. To the extent [Constant] wanted the jury to know Officer Rieg had an interest in the outcome of this case because he had filed a separate civil action, that fact was placed before the jury. Any information beyond that would have been completely irrelevant and the Court properly refused to permit [Constant] to make further inquiry into the details of the lawsuit.

Trial Court Opinion, 1/20/06, at 13–14 (citation omitted). We adopt the sound reasoning of the trial court, and affirm on that basis.

■ ¶ 25 In his next allegation of error, Constant asserts that the trial court improperly permitted the Commonwealth to introduce evidence of unrelated prior bad acts. According to Constant, the Commonwealth was permitted to introduce evidence regarding a prior encounter, at

Constant's home, between Constant and officers from the Mount Lebanon Police Department. Brief for Appellant at 30. Constant asserts that such evidence was inadmissible, and sought to portray Constant as a "violence-prone person." *Id.* at 31. Constant further argues that this evidence implicated Constant in prior "bad conduct," and that there was no link between the prior incident and Constant's motive in the instant case. *Id.* We disagree.

¶ 26 Pennsylvania Rule of Evidence 404(b) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa. R.E. 404(b). However, "evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id.*

¶ 27 In its Opinion, the trial court stated that evidence regarding a prior encounter between Constant and the Mount Lebanon Police Department was admissible to rebut Constant's claim that the shooting of Officer Rieg was an accident. Trial Court Opinion, 1/20/06, at 15. The trial court further stated that the evidence was also properly admitted to impeach Constant's denial of a motive for shooting Officer Rieg. The record supports the trial court's determination.

¶ 28 Prior to trial, Constant sought to preclude evidence of two prior encounters between police officers and Constant, which did not result in an arrest or the filing of charges. N.T., 1/25/05–2/2/05, at 3–4. At that time, defense counsel acknowledged that the evidence would not be admitted "unless something opens the door[.]" *Id.* at 3.

¶ 29 During opening statements, Constant's counsel introduced the defense theories that Constant did not have the requisite intent to commit the crimes charged because he had been drinking, and that the shooting was an accident. *Id.* at 49. Regarding the incident, counsel stated that

> [Constant], in a state of panic and in a state of fear, drunk, scared about his wife, wanting only one thing, to get these people out of there, to get them out of there, comes back with this gun and as the police officers say, he turned the corner and it went off. That was it.
>
> Now, this hallway in front of the house is a very, very, very small area as you will see in the pictures. If that gun goes off and he is holding it towards these people it is going to hit somebody and it did. This isn't a situation where he came in, aimed, took his time. No. He comes out with that gun wanting everybody to go and it goes off.

*Id.* at 53. Counsel also stated the following:

> ... You [the jury] are going to hear a lot of testimony in this case. A lot of it is about facts that are not essentially in dispute but there are fine points that you will have to decide and when you hear all of the testimony and all of the evidence it is going to come down to the question of [Constant's] state of mind, whether he had a specific intent to commit first degree murder and aggravated assault or whether he had acted in a reckless, panicked fashion improperly, perhaps illegally, but without the specific intent.

*Id.* at 61. Thus, counsel introduced the theory that Constant was drunk and did not intend to shoot at the officers, and that the shooting was an accident.

¶ 30 At trial, Constant presented several character witnesses. These witnesses testified regarding Constant's reputation for being a law-abiding citizen, and his reputation for non-violence. *Id.* at 639–77. During his direct examination of Susan, defense counsel elicited testimony supporting the defense theory that Constant had been drinking and did not have the requisite intent to establish the crimes charged. Susan testified that on May 26, 2002, after 7:45 p.m., she and Constant were both under the influence of alcohol. *Id.* at 688. Susan further acknowledged that when police came to the door, Constant was angry and agitated. *Id.* at 703. According to Susan, after Constant's gun first went off, she noticed that Constant was "totally dazed." *Id.* at 710. Susan further described Constant as "irresponsive [sic]." *Id.*

¶ 31 During cross-examination, the Commonwealth sought to rebut evidence regarding Constant's lack of intent, and sought to establish a motive and Constant's state of mind. Susan admitted that Constant had called the officers "Nazi bastards." *Id.* at 770. When asked if she knew why her husband had such hatred and contempt for police officers, Susan responded, "I don't think that [Constant] hates police. I think that he was very upset and made some misstatements." *Id.* Susan later testified as follows:

> Q. [The Commonwealth]: ... Did you ever have any reason to know that [Constant] had a hatred or contempt for the police?
>
> A. [Susan]: In fact I had every reason to believe that he did not have hatred or contempt for the police.
>
> Q. You had every reason to believe that he did not?
>
> A. Yes.
>
> Q. Why is that?
>
> A. Well, I have known Ed Constant 25 years. I have known him to be a law-abiding, upstanding person who had a

great, great deal of respect for the police.

Q. Did you ever know him to get angry at the police before?

*Id.* at 772. At this point in time, defense counsel objected to the introduction of the prior incidents between Constant and police officers. Ultimately, the trial court ruled that such evidence is relevant to Constant's motive and "thought processes at the time." *Id.* at 776.

¶ 32 Based upon the foregoing, this Court discerns no abuse of discretion by the trial court. Constant placed his state of mind, *including intent and motive,* at issue from the beginning of the trial. Evidence regarding Constant's alleged hatred of police officers, including prior incidents between Constant and police officers, was relevant to Constant's intent and motive at the time of the shooting, and a proper subject of cross-examination. Accordingly, we cannot grant Constant relief on this claim.

¶ 33 In his fourth allegation of error, Constant claims that the trial court improperly excluded evidence regarding Constant's level of intoxication, and expert testimony regarding the significance of this evidence. Constant presents three arguments in this regard. First, Constant asserts that evidence of his level of intoxication and expert testimony regarding the effects of his intoxication were relevant and necessary to negate the element of intent for the crime of attempted murder. Second, Constant claims that such evidence was necessary to support his claim of a lack of memory. Finally, Constant asserts that the trial court erred by refusing, in its jury instructions, to permit the jury to consider intoxication evidence on the issue of intent to kill. We will address each claim in turn.

■ ¶ 34 Constant first asserts that evidence of his level of intoxication and ex-pert testimony regarding the significance of this evidence is admissible to negate the intent element of the crime of attempted murder. We disagree.

¶ 35 Voluntary intoxication is not a defense to the crime of attempted murder. *Commonwealth v. Williams,* 730 A.2d 507, 512 (Pa.Super.1999). Section 309 of the Crimes Code limits the use of evidence related to intoxication, and provides as follows:

Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negate the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

18 Pa.C.S.A. § 308.

¶ 36 In *Williams,* this Court acknowledged that "[a]s § 308 clearly dictates[,] the only legal significance of the voluntary consumption of alcohol is when it is relevant to reduce murder from a higher degree to a lower degree of murder." *Id.* at 511 (quotation omitted). "In an attempted murder case the lowering of the degree is logically impossible. There simply is no such crime as attempted second or third degree murder." *Id.* Thus, the trial court properly ruled that evidence related to Constant's level of intoxication, and its effects, was inadmissible. Accordingly, Constant is not entitled to relief on this claim.

■ ¶ 37 Constant also asserts that such evidence is necessary to rebut the Commonwealth's challenge to Constant's lack of memory of the incident. According to Constant, the prosecutor attacked Constant's claim that a blackout caused his memory lapses. Brief for Appellant at 34–

35. Constant contends that the evidence of his level of intoxication and expert testimony regarding its effects were necessary for him to defend against these attacks. *Id.* at 35.

■ ¶ 38 Initially, we note that Constant was permitted to present testimony that he had consumed alcohol prior to the incident. *See, e.g., N.T.,* 1/25/05–2/2/05, at 933–34 (wherein Constant testified that he had consumed "a lot" of alcohol, and had been drinking gin martinis). Following Constant's cross-examination, defense counsel sought to introduce the intoxication evidence to rebut the Commonwealth's attack on Constant's *credibility* regarding Constant's recollection of the events. *Id.* at 1020. Our Supreme Court has repeatedly held that expert testimony cannot be used to bolster the credibility of a witness. *Commonwealth v. Minerd,* 562 Pa. 46, 753 A.2d 225, 230 (2000) (citing *Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284, 302–03 (1998)). "Whether the expert's opinion is offered to attack or to enhance, it assumes the same impact—an 'unwarranted appearance of authority in the subject of credibility which is within the facility of the ordinary juror to assess.'" *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1182 (1993) (citation omitted). Accordingly, we discern no error or abuse of discretion by the trial court in excluding this evidence.

■ ¶ 39 Constant also asserts error because "[t]he trial court refused to permit the jury to consider intoxication evidence on the issue of intent to kill and further instructed the jury that [Constant] could be convicted of the specific intent of attempted murder even if he did not have a conscious intent to kill." Brief for Appellant at 32. However, because evidence of voluntary intoxication is inadmissible to negate the intent element of the crime of attempted murder, we discern no error by the trial court in its jury charge. *See Williams,* 730 A.2d at 511 (concluding that voluntary intoxication is not a defense to attempted murder). Accordingly, Constant is not entitled to relief on this claim.

¶ 40 In his fifth allegation of error, Constant presents three separate claims. First, Constant claims that the trial court improperly refused to instruct the jury that it could consider evidence of Constant's character when assessing his credibility. Second, Constant claims that the trial court should have granted his requested jury instruction regarding the defense of others defense. Third, Constant claims that the trial court should have instructed the jury on the lesser crime of assault by physical menace. Brief for Appellant at 36. We will address these claims in order.

■ ¶ 41 Constant first asserts that the trial court improperly refused to instruct the jury that it could consider character evidence in assessing Constant's credibility. According to Constant, his character for truthfulness "was assailed by the prosecution on cross-examination." Brief for Appellant at 36. Constant contends that in *Commonwealth v. Fulton,* 574 Pa. 282, 830 A.2d 567 (2003), the Pennsylvania Supreme Court held that when a prosecutor's questions "have the actual effect of assailing the witness's veracity[,]" such a jury charge is required. Brief for Appellant at 37 (quoting *Fulton,* 830 A.2d at 577–78). We disagree.

¶ 42 In *Fulton,* the appellant claimed ineffective assistance of counsel based upon counsel's failure to present character witnesses. In addressing this claim, the Pennsylvania Supreme Court specifically stated that "character evidence of the defendant's truthfulness is admissible only if: (1) the character trait of truthfulness is implicated by the elements of the charged

offenses; or (2) the defendant's character for truthfulness was attacked by evidence of bad reputation." *Id.* at 569. The Pennsylvania Supreme Court further explained that "[o]ne's character for truthfulness refers not to suggestions of particular instances of honesty or dishonesty, but rather to one's general reputation in the community for telling the truth." *Id.* at 573. "Thus, where the prosecution has merely introduced evidence denying or contradicting the facts to which the defendant testified, but has not assailed the defendant's community reputation for truthfulness generally, evidence of the defendant's alleged reputation for truthfulness is not admissible." *Id.*

¶ 43 In this case, the Commonwealth did not assail Constant's community reputation for truthfulness, generally, but introduced evidence contradicting Constant's version of the shooting. Under such circumstances, character evidence was not admissible, and the trial court's admission of such evidence was an error that benefited Constant. However, because the character evidence at issue was, in fact, inadmissible, we cannot conclude that the trial court erred in denying Constant a jury charge on that evidence. Accordingly, Constant is not entitled to relief on his claim.

¶ 44 In his next allegation of error, Constant claims that the trial court improperly failed to charge the jury regarding the justifiable use of force for the protection of another person. Constant points out that both he and Susan testified that Susan was knocked to the ground by police officers. Brief for Appellant at 37. Constant asserts that the totality of the defense testimony was consistent with his having fired a gun in defense of his wife. Thus, Constant argues that he was entitled to an instruction regarding the justifiable use of force to protect a third person. We disagree.

¶ 45 The Crimes Code provides, in relevant part, as follows:

> The use of force upon or toward the person of another is justifiable to protect a third person when:
>
> * * *
>
> (3) the actor believes that his intervention is necessary for the protection of such other person.

18 Pa.C.S.A. § 506(a).

¶ 46 Our review of the record discloses that the evidence did not support a charge regarding the justifiable use of force for the protection of a third person. As the trial court stated in its Opinion,

> It is...important to note that [Constant] did not claim that he intentionally pulled the trigger of the weapon. He claimed at trial that he had no[ ] recollection of the decision of get[ting] the weapon or even of getting the weapon. He did not testify that he fired the gun at Officer Rieg because he feared for his wife's safety or life. In fact, he claimed that the gun just "went off." If he did not make a conscious decision to shoot the officer, then he cannot claim that he acted in defense of his wife. *Commonwealth v. Harris*, 542 Pa. 134, 665 A.2d 1172 (1995). [Constant] never testified that he fired the gun at Officer Rieg because he feared for the life of his wife. He said that he feared for her, but could not recall the decision to retrieve the gun and stated that he did not intend to pull the trigger. ( [N.T. 1/25/05–2/2/05,] at 951) Because [Constant] did not claim that he acted in defense of his wife when he committed the act of shooting Officer Rieg, he was not entitled to have the jury instructed on that matter.

Trial Court Opinion, 1/20/06, at 18. We agree with the reasoning of the trial court, and affirm on this basis.

¶ 47 Finally, Constant claims that the trial court improperly failed to instruct the jury on the lesser included offense of assault by physical menace. Constant contends that because there was "disputed evidence" concerning the number of shots fired, Constant's intent, and the direction in which the shots were fired, he was entitled to an instruction on the lesser charge. Brief for Appellant at 39.

¶ 48 A trial court must charge on a lesser included offense if there is some disputed evidence concerning an element of the greater charge or if the undisputed evidence is capable of more than one rational inference. *Commonwealth v. Hawkins*, 419 Pa.Super. 37, 614 A.2d 1198, 1200 (1992); *Commonwealth v. Ferrari*, 406 Pa.Super. 12, 593 A.2d 846, 848 (1991).

¶ 49 In his appellate brief, Constant provides no legal argument in support of his assertion that aggravated assault by physical menace is a lesser included offense of any of the charged offenses. Constant does not even identify the greater offense. He provides no analysis comparing the elements of each crime, or any application of that analysis to the evidence. Accordingly, we deem this claim to be waived.[4] *See Commonwealth v. Rodriguez*, 451 Pa.Super. 474, 679 A.2d 1320, 1325 n. 6 (1996) (deeming a claim waived based upon the appellant's failure to develop her argument in the appellate brief).

¶ 50 Based upon the foregoing, we conclude that Constant is not entitled to relief on his claims. Accordingly, we affirm the judgment of sentence.

¶ 51 Judgment of sentence affirmed.

¶ 52 POPOVICH, J., files a concurring statement.

CONCURRING STATEMENT BY POPOVICH, J.:

¶ 1 I agree with the majority's affirmation of the judgment of sentence. I write separately to express my disapproval of the actions of Judge Cashman's tipstaff during the jury's deliberations at the first trial. It is a fundamental principle in our justice system that a jury remains free from outside influence when rendering its decision.

¶ 2 The members of the jury testified regarding the tipstaff's actions during deliberations. While the jury's testimony was not completely consistent as to who initiated the conversation regarding the issue of intent, it is evident that the jurors recalled the tipstaff being involved in their deliberations to some degree. Our system of justice has rules to ensure that a jury is to base its decision solely on the evidence and the argument presented in the courtroom and not on any outside influence, especially a member of the judge's staff. *See Commonwealth v. Ogrod*, 576 Pa. 412, 839 A.2d 294 (2003). In my opinion, the tipstaff's actions during the jury's deliberations, at best as described by a juror that she was present during the deliberations, were wholly inappropriate and, at worst as some of the jurors described that she actively participated in the deliberations by posing hypothetical questions to the jury, were appalling and usurped independence from the jury. Whether the tipstaff only

---

4. Even if Constant had not waived this claim, we would deem it without merit. As the trial court noted in its Opinion, the evidence would not support a charge on the offense of aggravated assault by physical menace, as defined at 18 Pa.C.S.A. § 2702(a)(6). Accordingly, we would have affirmed on the basis of the trial court's Opinion with regard to this claim. *See* Trial Court Opinion, 1/20/06, at 18–19.

nodded her head in agreement or actively participated in the deliberations is immaterial because in several of the jurors' minds, Judge Cashman's tipstaff played a part in the jury's deliberations. As a former trial court judge, I am dismayed at what transpired.